GARRET A. HOBART, receiver &c., appellant,

*v.*

MARY A. DOVELL, respondent.

If a bank teller knowingly assist the cashier or any other officer in embezzling the funds of the bank, he will be civilly responsible for the loss to which he thus contributes.

On appeal from a decree advised by Vice-Chancellor Bird, whose opinion is as follows:

There are difficulties about this case, but my mind inclines to the conviction that the complainant is entitled to an account. The difficulty with me has arisen from the part taken by Louis Dovell, the son of complainant, and the second teller, in the unlawful transactions, and his near relationship to and influence over the complainant. I think, however, that principles which would reject a prayer by him would be more merciful to her. Her advanced age, too, justifies a court of equity in considering more favorably the circumstances attending the individual case.

I conclude, also, that there is no evidence to charge Louis Dovell with abstracting any money from the bank. That his accounts exhibited a deficiency admits of no doubt. His statement is that the work which resulted so disastrously to the bank, was carried on for two years and more under the management and direction of Hedden, the cashier. Although he was aware of Hedden's manipulations, yet the teller never ventured to expose the crime until December 23d, 1874, when, at the close

of the day, his accounts would not balance by $95,827.07, according to his own showing. Perhaps the testimony shows that others are quite as responsible for this concealment as the teller. However, at the close of the day, he wrote to three of the directors (those three who had shown most interest in the management of the bank), and invited them to meet him at the bank. They met him, and he revealed to them the immense gap in his accounts for the day. They spent over two hours with him in endeavoring to solve the frightful problem. I cannot but inquire, Why spend a moment at calculations or adjustments if his statements were confessions of crime? His mother held the title to a number of parcels of valuable real estate, and also was the owner of a valuable business; her son says that he told the directors that he would procure her to convey all these to the bank, to be held by it as security until they could satisfy themselves as to his liability. This she did the next day.

It is urged that a liability on her part arises, even though the teller has been guilty of no malfeasance, because he obeyed the commands of his superior. He was, doubtless, under a high moral obligation to expose Hedden, even though his statement that he supposed the directors knew of the perfidy be laid out of view. But Mrs. Dovell is not surety for a merely moral delinquency.

I have said that I am not satisfied that there is any evidence to charge the teller. I think that although the defalcations may not be traced to their beginnings, they are generally quite satisfactorily accounted for. Indeed, in this respect, I am quite confident that the complainant proceeded fully as far as the rules of evidence require. As between the complainant and defendant, I think the burden rests with the defendant. She is only a surety; to that end she pledges her estate. She rightfully says to the defendant, "I want my property returned to me, unless you can show a liability on the part of my son. You say his accounts are wrong, and that he has taken moneys from the bank and not replaced them; establish that now or account to me for what you have of mine." I think this is the true relation of these parties. If I am right in this, then I am clearly justified in concluding

that the defendant has failed to show any liability on the part of Louis Dovell, such as will bind the complainant.

But it is said that the teller confessed himself guilty. I cannot believe he did so in the sense contemplated. I believe he did so to the extent of allowing Hedden to compel him to make numerous large false entries. Consider the fact that he was allowed to deposit all his receipts for that day in the bank vault after his disclosures, and to lock the bank itself and to carry away the key, and that he was not arrested nor put under guard, or in any manner watched, and it does seem impossible to believe that three leading, active, shrewd and able business men had just heard the teller of their bank say, " I appropriated $95,000 of the bank's money to my own use." However desirous to save the reputation of the bank, and to secure a pledge equivalent to the defalcation, they certainly would not have trusted the man out of their sight who had committed such a crime, until the offered pledge was in their hands, if he had unmistakably made the crime known.

But whatever the son may have said, the complainant being a surety, and having given the property in pledge, is entitled to full and clear proof of liability on the part of the son before the bank can hold her property against her. There is no such proof. The son denies that he ever made any such admissions. That Hedden was constantly making false entries, or directing them made, and using false vouchers as a basis for such entries, to amounts exceeding $60,000, if not a great deal more, is not questioned. And, while it has not been shown just how the discrepancy of $95,000 arose, yet not one dollar of it has, in any other sense than it is in his accounts, been traced to Louis Dovell's hands. There is nothing, outside of the fact that he was teller, in his life, habits or business, that has given rise to a breath of suspicion, so far as the evidence now before me discloses. And where there is such abundant proof against another, proof that would compel that other to answer for every dollar of this loss, the court certainly cannot force conclusions as to this teller, in order to reach the property of his mother.

Again, it is insisted that the teller, knowing of Hedden's guilt,.

.and allowing himself to be used by Hedden, is equally liable with Hedden. This may be so, criminally, but I think not so, civilly, under the circumstances of this case. It is sufficient as to the first to say that Mrs. Dovell knew nothing of any crime. .She says that she spoke to her son on that point and that he expressly denied it. And as to the second point (his civil liability for the acts of his superior), I cannot subscribe to that doctrine. Besides, the complainant only pledged her property to secure the bank against her son's default, and she ought not, on principles of the plainest equity, to be held for the defaults of ·others of which she had no knowledge and which were no part ·of the contract.

The doctrine of laches has been very forcibly pressed against the complainant. The argument has been very skillfully fortified by highest authority. However, I do not think I am required to apply the ·rule in this case. I take into account the facts that the complainant is an old woman, quite feeble in body, .but slightly versed in business, evidently quite illiterate, that she .never was informed by the directors nor any one else of the true nature or extent of the defalcation—whether such defalcation lay ·at the door of her son in whole or in part, either morally or .legally, excepting only so far as the son himself informed her; ·that, as between the bank and the complainant, it was its duty to force the issue; and that whether the burthen of taking the initiative was upon her or not in obtaining a judgment or decree, the law will grant to either a *reasonable time* for investigation, .accounting and settlement, before it will allow the doctrine of laches to take hold.

A reasonable time for the performance of a duty or obligation .is never out of the mind of a court of equity. In this case an account was to be taken. The complainant could rest most securely until that was done. She did not convey her property to .pay an ascertained debt or any certain part of it. There was no ascertainment as to her, or, so far as she was informed, either of the debt or of the value of her property, nor as to the bank, of the value of her property, except roughly and generally. She ·was not an accountant. She had no access to the books of the

bank containing the accounts. She could not have understood them if she had had access to them, for it seems that no one can understand them. They are falsified, and the falsifications run through many years.

I conclude that, as between the complainant and defendant, it was the duty of the defendant to ascertain, by an accounting, the extent of the liability of Louis Dovell, as teller, before he can claim a right to retain the property of the complainant. In this, the initiative was with the defendant. The defendant was entitled to a reasonable time to perform this duty, without costs or legal interference. I am quite sure that if the doctrine of laches can be applied to the complainant at all, she would be justified in giving more time; for her position has some of the aspects of a complainant mortgagor, who files his bill to redeem. But, at all events, laches or limitations would not begin to run in such a case as this until the expiration of at least two years.

In this case, two years would not be an unreasonable time for the law to allow the bank to make and state an account of so many intricate transactions. This will be conceded by any one who reads the many hundreds of pages of testimony taken in this case. For nine months, at least, have the very learned and skillful counsel for the defendants had this matter under investigation, and still I believe, to them, there is much that is mysterious and doubtful. Besides, it is to be noted that the case discloses the fact that at least two of the eminent counsel for the defendant had been long engaged, by and with the aid of skillful experts, in endeavoring to trace and discover the history of the transactions by which the bank was plundered.

I think, as between the complainant and defendant, she is entitled to a reconveyance of all the lands which the bank still holds, and to an account of all the moneys received by the bank for lands sold to *bona fide* purchasers, and for all rents of any of these lands received by the bank, for all other moneys received by the bank for stock sold, or accounts of R. B. Dovell & Son, which were credited to the account of Louis Dovell. I come to these conclusions, notwithstanding the execution and delivery of the four notes by Louis Dovell, dated January

1st, 1876, to Hedden, in the name of the bank, as payment for $106,491.01. Dovell says Hedden told him, before he gave the notes, that he wanted to use them in New York, and would return them to him again. The notes were never used at all. Dovell's statement as to the purpose and understanding at the time is not contradicted. He also gave four other notes for the same amounts, but, instead of signing his own name, signed " R. B. Dovell & Son." He gave these first, and when it appeared that Hedden did not want them so signed, he asked for the notes signed by Louis Dovell, in his own name. Louis took them and left all the eight notes with Hedden, in all amounting to $212,000. As this case stands, I think this transaction has no other significance than to show to the court the supreme control of Hedden over the manifestly weak, if not deficient, Dovell. Yet counsel for defendant pressed the giving of these notes as conclusive of the defalcation and its exact extent. It strikes me, however, this insistment is all broken up by the fact that these notes were given for the entire defalcation, including Hedden's, too, without any regard to the large and valuable real estate, and without regard to the proceeds of the business which the bank was managing.

I shall advise a decree in accordance with these views.

*Mr. J. Frank Fort* and *Mr. A. Q. Keasbey*, for appellant.

The bill in this case is filed against the First National Bank of Newark and Garret A. Hobart, its receiver, who was appointed by the comptroller of the currency on the 10th day of June, 1880, upon the insolvency of the bank.

The bill was filed in March, 1881. The substance of it is, that, in 1864, nearly six years before the failure of the bank, Louis Dovell, the son of the complainant, who was then the teller of the bank, found a deficiency of about $90,000 in his accounts; called some of the directors together, explained to them the fact that such deficiency existed, but denied that he had taken the money for his own use, and proposed to cause the property of his mother, who was surety on his teller's bond, to be conveyed to the bank, to be held in trust to secure the bank

Hobart v. Dovell.

for any deficiency which might be found, on examination, to exist, caused by his embezzlement or wrongful appropriation of the moneys of the bank. That a number of tracts of land were accordingly so conveyed to certain directors of the bank, who afterwards conveyed them to the bank. That all the property so conveyed was taken possession of by the bank, except a house in Summer avenue, occupied by his mother. That the bank, after 1876, received all the rents and profits of the real estate, except the Summer avenue lot. That several portions of the real estate so conveyed were subject to mortgages, and were afterwards sold under foreclosure, the complainant being unable to protect them and the bank neglecting to do so. That the bank still held the tract in Summer avenue, a tract in the city of Newark, on the south side of Maiden lane, and one undivided half of certain lands in Clinton. That the directors promised to investigate Louis Dovell's accounts and ascertain the deficiency, if any existed, but neglected to do so. After the insolvency, the receiver took possession of the remaining real estate, and was seeking to recover possession, by ejectment, of the lot in Summer avenue. That the deficiency apparent in the teller's accounts was not an actual deficiency, and that he did not wrongfully take any funds of the bank to any amount. That the cashier, Hedden, had caused the apparent deficiency by fraudulent dealing with the funds of the bank. That the complainant had also transferred to the bank certain notes and money for the same purpose for which the real estate had been transferred, and also certain stock of the bank, which was held by the Newark Savings Institution as security for a loan and was sold by the Savings Institution to satisfy its debt, whereby she lost her equity in the stock and was made liable for the deficiency.

The prayer of the bill is that an account may be taken of all the property transferred to the bank, and that the receiver may account for what was then held by him as such, and may set forth an account of the alleged deficiency and how it arose, and of what it consisted, and the disposition that the bank made of the savings institution stock, and the particulars of the complainant's account, under the firm name of R. B. Dovell's Son,

with the bank, and what charges and credits and other items have been added to it since the transfer of the property to the bank, and that an account of all the transactions of the teller with the bank may be taken, and the amount of his defalcation, if any, ascertained; and also of the damages sustained by the complainant by reason of the fraudulent and negligent acts of the bank; and of the rents and profits received by the bank from the real estate, and if it shall appear that Louis Dovell has not taken any funds of the bank wrongfully, that the receiver may be decreed to pay over to the complainant the total amount of money realized by the bank from the sale or collection of the property, notes and commercial paper, with interest, and the amount of rents, and that he may be decreed to reconvey to her all the real estate and personal property which was conveyed to the bank, remaining in his possession, and if it shall appear that he was indebted to the bank or to the receiver by reason of his having wrongfully taken the funds, the same may be deducted from the property and money so transferred to the bank, and the balance paid over, transferred and reconveyed to her.

The answer of the receiver denies all knowledge of the affairs of the bank relating to Louis Dovell; admits that the land was conveyed to the directors; claims that the deeds were absolute, and that he was assured by the directors that they were made to indemnify the bank to the extent of the value of them, for losses arising to the bank by reason of the deficiency, howsoever caused, and denies that they were made in trust for the purposes set forth in the bill; that the receiver had discovered that the cashier and teller were largely in default to the bank, and that both or one of them had abstracted or misapplied a large amount of the funds; that he was unable to ascertain what amount of defalcation or deficiency was due to the receiving teller, Louis Dovell, or other parties; that he cannot tell whether the deficiency was apparent and not real, but alleges that he was informed by the directors of the bank that Dovell admitted his liability to make good the deficiency; that the transfer was made for the purpose of enabling the officers of the bank to dispose of the property

for the best price that could be obtained, and apply the proceeds towards the satisfaction of the deficiency, howsoever the same might have been caused, and insists upon his right to dispose of the premises for the purpose of using the proceeds for the reduction of the debts of the bank and the re-imbursement of the stockholders.

The decree of the court directs that the receiver shall forthwith execute a deed to the complainant for all the real estate remaining, and pay to the complainant all the moneys received by the bank, or any person for its use, from the sale of the real estate, or from the rents or profits of the real estate and personal property, less sums paid out for taxes and insurance; and all moneys received by the bank or for its use from the complainant, on account of the contract of indemnity, with interest on all sums so received from the time when received, and that it be referred to a master to ascertain these amounts.

I. Upon this statement, it is manifest that the relief prayed for by the bill and directed by the court is entirely inappropriate, and that the decree is incapable of execution. It directs an account of moneys and property received by the bank more than six years before the suit was brought, and the absolute transfer and payment of the whole of it by the receiver to the complainant, irrespective of the rights of the creditors of the bank, making the complainant a preferred creditor for whatever amount may be found due from the bank to her under the decision of the vice-chancellor.

This implies an entire misconception of the rights of the complainant against the receiver of a national bank, and of his duties in respect to the assets which come into his hands.

By the act of congress (section 5234), it is the duty of the receiver to "take possession of the books, records and assets of every description of the bank; collect all debts, dues and claims belonging to it, and shall pay all moneys over to the treasurer and report all his acts and proceedings to the comptroller of the currency," and by section 5235 it is provided that the comptroller shall, upon appointing a receiver, cause notice to be given

for thirty days in such newspaper as he shall direct, calling on all persons having claims against the bank to present the same and make legal proof thereof," and section 5236 provides that, after paying to the United States any deficiency in redeeming the circulating notes of the bank, the comptroller shall make a ratable dividend of the money in his hands on all such claims as may have been proved to his satisfaction, or *adjudicated in a court of competent jurisdiction*, and so continue as the assets are paid over to him. The remainder of the proceeds, if any, shall be paid to the shareholders in proportion to the stock held by them. *Van Antwerp* v. *Holland, 8 Blatchf. 282; Bank of Bethel* v. *Pahquioque Bank, 14 Wall. 383; Case* v. *Bank, 100 U. S. 446.*

II. But, upon the merits of the case, the complainant is not entitled to recover. It is a stale demand, and relief should be refused on the ground of laches. *Smith* v. *Clay, 3 Bro. C. C. 640; Mooers* v. *White, 6 Johns. Ch. 360–368; Rayner* v. *Pearsall, 3 Johns. Ch. 578–585; Stout* v. *Seabrook, 3 Stew. Eq. 187; 1 Story Eq. Jur. 529; Foster* v. *Hodgeson, 19 Ves. 179–185; Twin Lick Oil Co.* v. *Marbury, 91 U. S.; Badger* v. *Badger, 2 Wall. 90; Harwood* v. *R. R. Co., 17 Wall. 78; Marsh* v. *Withorn, 21 Wall. 178.*

This is not a case of direct trust, and therefore the lapse of time is a bar applicable in equity, in analogy to the statute of limitations at law. *McClane* v. *Shepherd, 9 C. E. Gr. 76;* and see *1 Pom. Eq. Jur. 418, 419 and cases cited.*

III. The allegations of the bill upon which the claim for relief is founded, are not proved. As to the stock of the bank, alleged to have been transferred, it was held, at the time, by the Newark Savings Institution, to secure a debt, and was sold by that institution for a less amount than its claim, and nothing was received by the bank on that account. As to the alleged transfer of personal property, there is no evidence that the business of Mrs. Dovell, or of R. B. Dovell's Son, was transferred to the bank, and such small amounts as were paid in to the bank on account of R. B. Dovell's Son, were duly credited to the

account, and an examination of the books will show that the bank realized nothing on account of the deficiency of the teller, except about $4,000.

It is not denied that a deed absolute on its face may be shown, by parol evidence, to have been intended as a mortgage, whether by distinct proof of the contract or by surrounding circumstances, except as to *bona fide* purchasers for value without notice. But it is also true that the presumption arises that the instrument is what it purports on its face to be—an absolute conveyance of land. To overcome this presumption, and to establish its character as a mortgage, the cases all agree that the evidence must be clear, unequivocal and convincing, for, otherwise, the natural presumption will prevail. *3 Pom. Eq. Jur.* § *1196; Plumer* v. *Guthrie, 76 Pa. St. 455; McGinty* v. *McGinty, 63 Pa. St. 38; Bailling* v. *Brasulin, 102 Ill. 441; Maher* v. *Farwell, 97 Ill. 56; Knowles* v. *Knowles, 86 Ill. 1; Wilson* v. *McDowell, 78 Ill. 517; Phillips* v. *Croft, 42 Ala. 477; Andrews* v. *Hyde, 3 Cliff. 516.*

*Mr. Joseph Coult* and *Mr. H. C. Pitney*, for respondent.

The opinion of the court was delivered by

DIXON, J.

In 1874, Louis Dovell was, and for a long time had been, the receiving-teller of the First National Bank of Newark. About December 22d of that year he disclosed to the president and two directors of the bank that his accounts were short nearly $90,000, and offered to convey to the bank his own property, and to procure from his mother, Mary A. Dovell, a conveyance to the bank of her property, because of this deficiency. On the following day, such conveyances were made to two of the directors, who afterwards conveyed the property to the bank. In June, 1880, the bank failed, and Garret A. Hobart was appointed its receiver under the laws of the United States by virtue of which it was organized. In March, 1881, Mary A. Dovell filed her bill in the court of chancery against the receiver,

praying that an account might be taken of the transactions between her son and the bank, and that if it should appear that her son had not taken any of the funds of the bank wrongfully, then the receiver should reconvey to her such property as he still had of that conveyed by her, and should pay to her whatever the bank had realized from the residue thereof, or if it should appear that Louis Dovell was indebted to the bank by reason of his having wrongfully taken its moneys or funds, then such reconveyance and payment should be made after deducting the amount of that indebtedness.    The receiver's answer, in terms, avers that the conveyances were absolute and that he claims absolute title to the property, but it admits that the transfer was made " to indemnify the bank for losses arising by reason of the said deficiency," and " for the purpose of enabling the officers of the bank to dispose of the property for the best price they could obtain, and apply the proceeds thereof towards the satisfaction of the said deficiency." Proofs having been put in, the cause was argued before the vice-chancellor, and three main questions were there presented : 1st, whether the conveyances were absolute; 2d, if not, for what purpose were they made ; and, 3d, whether the complainant was entitled to an account and to a reconveyance and payment in case of a surplus after satisfying the purposes of the transfer.

The vice-chancellor decided that the conveyances were not absolute, that they were made for the purpose of securing a restoration to the bank of such moneys, funds or property as Louis Dovell himself had embezzled, abstracted or misappropriated, and that, since the evidence failed to satisfy him that Louis Dovell had personally abstracted anything from the bank, the receiver should at once reconvey to the complainant the property which he retained, and should account for and pay over to her all moneys realized by the bank from the residue.

Hence this appeal by the receiver.

We agree with the learned vice-chancellor that the conveyances were not absolute.    The answer, in effect, admits this, and the testimony makes it clear.

But we do not think the purpose of the transfer was so restricted.

as it was deemed in the court below. Our conclusion is that it was designed to indemnify the bank, not only for funds abstracted by Dovell himself, but also for all of the deficiency for which he was civilly responsible. To this effect is the affidavit of the complainant herself, annexed to her bill. She executed the deeds at the instance of her son, and on consultation with him alone, and in narrating the interview between them that led to the conveyance, she says:

"He stated to me that he had not taken or misapplied any of the funds of the bank, nor any of its securities or property, and that as soon as an examination of his accounts could be had, and it could be determined whether he should be charged with any of the said deficiency or not, there should be a settlement between me and the bank, and in case there was no deficiency chargeable to him, I should get back whatever I furnished as security; or if it was found that he was liable for any part of it, I should get back the security upon the payment of that part for which he was liable."

So, in her testimony, she says the transfer was made until it could be found out "whatever deficiency or whatever it was there might be against him," for the purpose of securing to the bank "whatever they brought against him." Of similar import is the evidence of the son, when he says he told the directors, speaking of the shortage in his accounts, "If it is through anything I have done, why, I am willing to make it perfectly good, and will secure you until you can find it out." The evidence of the directors engaged in the transaction indicates that they understood the conveyances as being intended to meet the deficiency, no matter how it had occurred, or rather as one conceded to have been occasioned by the teller's default alone, but we think this inference was hardly warranted in its unconditional form. The circumstances of the teller's disclosure certainly gave rise to a strong suspicion of personal delinquency in him commensurate with the apparent loss, but they are not to be regarded as conclusive.

The testimony hitherto produced indicates that the deficiency arose, in whole or in great part, from the embezzlement, by the cashier, of moneys in the hands of Dovell, the teller. Some of the cashier's transactions were of such a nature that it is difficult

to believe that the teller was not apprised of their dishonest or unauthorized character, yet nevertheless he lent himself to their furtherance by actually delivering to the cashier the money which he asked for, and concealing the facts beneath false statements in his accounts. For knowingly assisting in such an abstraction, the teller would be as responsible to the bank as if he had spent the money himself. He was an officer of the bank, having certain prescribed duties, for the faithful performance of which he was bound directly to the corporation. No orders of the cashier could exculpate him in the breach of those obligations. Within the scope of the cashier's authority, and so long as he was apparently acting on behalf of the corporation, the cashier's directions might control the teller, and the latter might not be required to look beneath the surface of his superior's acts. But when he was led to believe that the cashier was violating his own duty to the bank, and was taking the bank's funds for his own ends, irregularly, and without authority from the directors, the teller had no more right to aid in or connive at such misappropriation than if it were being perpetrated by a stranger. The same principle would hold if the embezzler were a director or the president. Such misconduct on the part of Dovell we think the evidence tends to establish in more than one instance; and so far as it helped to effect a loss to the bank, he is answerable.

Until the amount of this deficiency is determined, there should be no reconveyance.

We are therefore of opinion that it should be ascertained, by reference to a master or by an issue triable before a jury, how far the misconduct of the teller contributed to the deficiency, and to that extent the bank is entitled to re-imbursement out of the property transferred. The receiver should render an account of this property and its proceeds, and return the surplus, if any.

Let the decree below be reversed, and a decree be entered in accordance with these views.

For affirmance—KNAPP, REED, VAN SYCKEL, WHITAKER. —4.

For reversal—THE CHIEF-JUSTICE, DEPUE, DIXON, MAGIE, PARKER, SCUDDER, COLE, PATERSON—8.